NEWMAN, Circuit Judge,
concurring in part, dissenting from the judgment.
I agree generally with the court’s discussion of the ’903 patent and the prior art. However, I conclude that the Patent Trial and Appeal Board correctly held the claim invalid on grounds of obviousness and inherency. No dispositive error of law, no absence of support of dispositive findings by substantial evidence, has been shown. I would affirm the Board’s decision, and thus I respectfully dissent from the ruling of vacatur and remand.
Discussion
The subject claim of the ’903 patent is:
1. A method comprising:
a) administering a cyclic guanosine 3’,5’-monophosphate (cGMP) type 5 phospho-diesterase (PDE 5) inhibitor according to a continuous long-term regimen to an individual with at least one of a penile tunical fibrosis and corporal tissue fibrosis; and
b) arresting or regressing the at least one of the penile tunical fibrosis and corporal tissue fibrosis, wherein the PDE-5 inhibitor is administered at a dosage up to 1.5 mg/kg/day for not less than 45 days.
’903 Patent, col. 68, lines 23-32. The references cited by the PTAB show the subject cGMP products for treatment of erectile dysfunction, and discuss the mode of action in erectile dysfunction. The cited references are in the same field of endeavor, and include a review article. I outline some relevant PTAB findings:
• the prior art shows that the cGMP products of claim 1 were known PDE-5 inhibitors, and known to relieve erectile dysfunction;
• the prior art shows use of these cGMP products in the claimed dosages and over extended time periods.
• the prior art shows that penile fibrosis was known to be a cause of erectile dysfunction.
The PTAB held trial, with evidence and expert witnesses from both sides. The Board concluded that the subject matter of claim 1 would have been obvious in view of the cited references.' Reversible error in *1069 this conclusion has not been shown, and the Board’s findings on which its conclusion was based are supported by substantial evidence.
The court’s extensive opinion sets forth the relevant facts, which I repeat only as needed to explain why I conclude that our proper action is to affirm the decision of the PTAB.

PDE-5 inhibitors were known to treat erectile dysfunction, which was known to be caused by penile fibrosis.

That penile fibrosis is a cause of erectile dysfunction, and that erectile dysfunction is relieved by treatment with these PDE-5 inhibitors, was known before the filing of the ’903 application. LABio stresses that erectile dysfunction was known to have other causes, such as diabetes, atherosclerosis, and psychological problems. However, on the prior art and expert testimony that when penile fibrosis was present it was affected by the PDE-5 inhibitors, the Board found that this effect was inherent in the use of these products to treat erectile dysfunction.
There was no claim that the ’903 inventors discovered that penile fibrosis is a cause of erectile dysfunction. Their work is described as relating to understanding the production of nitric oxide, and other scientific aspects of the mechanism of erectile dysfunction and how PDE-5 inhibitors work. I do not diminish the scientific value of their investigations. However, this does not diminish the evidence and the Board’s findings that PDE-5 inhibitors were known and used by others under the conditions set forth in claim 1.
Claim 1 is directed to use of the cGMP PDE-5 inhibitors in dosages and for periods shown in the prior art; and the Board found that this use existed in the prior art, with the effect on penile fibrosis inherent in this use. This finding is supported by substantial evidence. In Atlas Powder Co. v. Ireco, Inc., 190 F.3d 1342, 1346 (Fed. Cir. 1999), the court explained that “if granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art.”
We are reminded of the truism that “that which infringes if later anticipates if earlier.” Polaroid Corp. v. Eastman Kodak Co., 789 F.2d 1556, 1573 (Fed. Cir. 1986) (quoting Peters v. Active Mfg. Co., 129 U.S. 530, 537, 9 S.Ct. 389, 32 L.Ed. 738 (1889)). Both parties have advised that LA-Bio has charged Lilly with “willfully inducing infringement of the ’903 patent by marketing Cialis®, whose active ingredient is the PDE-5 inhibitor tadalafil, to erectile dysfunction patients for daily use, knowing and intending that it would be used to treat the penile fibrosis of those erectile dysfunction patients suffering from that underling condition.” LABio Br. 12.[1] I agree with the court that this representation is relevant to the issues of obviousness and inherency, for the prior art shows such daily use and at the claimed dosages.

The cited references lead to the PTAB’s ruling of obviousness

The Montorsi reference is a review article published in April 2002, entitled “The Ageing Male and Erectile Dysfunction.” The Whitaker reference is an international application published November 1, 2001, entitled “Daily Treatment for Erectile Dysfunction Using a PDE5 Inhibitor.” The Porst reference is an article entitled “Daily IC351 [tadalafil] Treatment of ED,” published in September 2000.[2]
*1070 At the PTAB trial, witnesses discussed the mechanism whereby penile fibrosis is related to erectile dysfunction, and the mechanism of these cGMP compounds in PDE-5 inhibition. The PTAB found that “treatment of ED in elderly patients or patients with atherosclerosis, as suggested by both Montorsi and Whitaker, would result in treatment of patients with the fibrosis, as Montorsi teaches that corporal fibrosis is associated with ED in those patient populations.” PTAB Op. at 22. Substantial evidence supports this finding.
The PTAB cited Montorsi, which is a review of the causes of erectile dysfunction, an ailment that had been extensively studied over the years. Montorsi reports on the use of cGMP compounds as PDE-5 inhibitors, and compiles information from many scientific publications. Montorsi describes studies investigating the causes of erectile dysfunction in aging men, summarizing that “it seems reasonable to hypothesize that the ED from ageing is the result of atherosclerosis-induced caverno-sal ischaemia leading to cavernosal fibrosis and veno-occlusive dysfunction.” Montorsi at 31.
Montorsi describes a study “wherein sil-denafil was taken as required, but no more than once daily, over ¿ 12 week to 6 month period,” relied on by the PTAB to show “that sildenafil is an effective treatment of ED in elderly men.” PTAB Op. at 20. The court observes that “Montorsi teaches that corporal fibrosis is associated with erectile dysfunction in atherosclerosis of aging patient populations,” Maj. Op. at 1065, and finds that substantial evidence supports “the Board[s] finding] that Whitaker taught the chronic administration of PDE5 inhibitors to individuals with erectile dysfunction.” Id. at 1065. I agree. Whitaker states that “[t]o receive the full benefit of the present invention, chronic administration generally refers to regular administration for an extended period,preferably daily for three or more days, and still more preferably daily as long as the patient suffers from erectile dysfunction (in the absence of therapy).” Whitaker at 7. Lilly’s expert testified that “it would take ‘months’ to resolve ED based on circulatory dysfunction due to diabetes, atherosclerosis, smoking hypertension or a combination of those factors (i.e., Whitaker’s patient population).” Goldstein Deck at 73.
The court cites Whitaker’s statement that “[i]t is expected that- vascular conditioning occurs after chronic administration of the PDE5 inhibitor, ...” Maj. Op. at 1065, citing Whitaker at 13. My colleagues criticize Whitaker’s lack of data on vascular conditioning. Id. at 1065. However, that does not erase Whitaker’s teaching of chronic administration; and I point out that claim 1 does not mention or require vascular conditioning. The PTAB found that “Whitaker expressly teaches once daily dosing, teaches that treatment should last as long as the erectile dysfunction continues, and expressly teaches time periods of eight to twelve weeks.” PTAB Op. at 21. These findings are supported by substantial evidence.
On this appeal LABio argues, as it did during prosecution, that “[t]he pending claims are directed to a ‘curative’ effect as opposed to a ‘palliative’ effect ... for a long-term result (e.g., years), not a patho-physiology (function) for a very short-term result of a vasodilation (e.g, hours, maximum 2-3 days.” LABio Br. 10. However, *1071 the references show use longer than hours or 2-3 days. The Porst reference shows clinical trials in which tadalafil was administered for three weeks to “men with mild to moderate erectile dysfunction.” The dosages were in the range shown in claim 1. The PTAB considered this reference in combination with the references to Mon-torsi and Whitaker; no error has been shown in this combination for the treatment of erectile dysfunction.

The PTAB’s decision accords with precedent

Precedent has dealt with a variety of factual situations in which a purported new use or property has been discovered for a known product, and patentability is sought on various premises. In Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc., 246 F.3d 1368 (Fed. Cir. 2001), the court held that “[njewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent,” having observed that the claimed term “for reducing hematologic activity” “merely express[ed] a purpose” and is “non-limiting.” Id. at 1375, 1376.
Alcon Research, Ltd. v. Apotex Inc., 687 F.3d 1362 (Fed. Cir. 2012), involved a claim to a method comprising “stabilizing conjunctiva! mast cells by topically administering” olopatadine in a known composition. Id. at 1364. The prior art described the known composition used as an antihistamine. Id. This court reversed the district court’s finding that a person would not have used the composition to stabilize mast cells because “a person of ordinary skill in the art at the time of the invention would have been motivated to use olopatadine to treat human eye allergies as claimed for its established antihistaminic efficacy.” Id. at 1369.
A contrary result was reached in Allergan, Inc. v. Sandoz Inc., 726 F.3d 1286 (Fed. Cir. 2013), where the proposed claim was for “reducing the number of daily topical ophthalmic doses.” Id. at 1289. The court held that the enhanced efficacy was not taught in or suggested in the prior art or inherent in the prior dosage regimen, Id. at 1294, and allowed claims to the multiple daily doses. In Alcon Research, the court allowed claims to a specific high concentration of a known product for treatment of allergic eye disease, finding that the prior art only taught lower concentrations, and that the higher concentration would not be obvious to try. Id. at 1370. And in Rapoport v. Dement, 254 F.3d 1053 (Fed. Cir. 2001), the court upheld claims to the use of a known product to treat sleep apnea, holding that the prior use to treat anxiety “did not address treatment of the underlying sleep apnea disorder” because the sleep apnea treatment was not inherent in the prior art’s anxiety treatment. Id. at 1060, 1062-63. While LA-Bio states that Allergan and Rapoport support its position, each of those cases relies on facts missing here.
Precedent thus illustrates that the later discovery of a new and unobvious use of a known product may be patentable when the standards of unobviousness are met. Here, however, penile fibrosis was known in the prior art to be a mechanism of causing erectile dysfunction. A person of ordinary skill would, as the PTAB found, use the claimed compounds at the claimed doses for the claimed duration, for the purpose of treating erectile dysfunction in patients with penile fibrosis. The PTAB’s findings are supported by substantial evidence, and its conclusions based thereon are in accordance with law. See Alcon Research, 687 F.3d at 1369 (“Given that the patent defines, and expressly claims, olo-patadine concentrations that are ‘therapeutically effective’ to stabilize conjunctival mast cells, Kamei’s disclosure of overlapping concentrations, even if for a differ *1072 ent purpose, meets these claim limitations.”)- The PTAB’s decision should be affirmed.

Finality and the America Invents Act

I respectfully dissent from my colleagues’ judgment of vacatur and remand, for such further proceedings fail the policy and purpose of the America Invents Act, and should be invoked only when there are major defects in the PTAB proceeding, requiring activity and redetermination that is not available on the appellate record.
The court at its footnote 9 takes issue with my position that our appellate obligation is to decide the appeal on the record on which the appeal reaches us. The court states that if an aspect is insufficiently established in the PTAB proceeding, our appellate role is to remand, despite the usual protocol that when sufficient basis has not been provided to support a necessary ruling, the side with the burden of establishing that position, loses. When, as here, the dispositive facts are not in dispute, it is not customary to authorize the deficient party to return to the trial tribunal to try again.
The America Invents Act adds rigor to this protocol, for the AIA created an expedited administrative procedure with strict time limits. Within these time limits, the parties must present their case and the PTAB must make its decision. It negates a foundation of the AIA for the appellate tribunal simply to remand for further proceedings after the statutory deadline. Our obligation is to decide the appeal as it reaches us.
According to the majority, the Board did not find that the prior art‘taught “long-term administration (i) to an individual with penile fibrosis (ii) in an effective amount to arrest or regress the fibrosis.” Maj. Op. at 1064-65 n.7, 1067. Respectfully, the majority is incorrect, because the Board expressly found that the Whitaker reference taught long-term administration to patients with erectile dysfunction, and the Board expressly found that in some of those patients erectile dysfunction is caused by penile fibrosis. It is not necessary to return to the Board to find whether the prior art administered “an effective amount to arrest or regress the fibrosis,” id. at 1065 n.7, because LABiomed has conceded that it does; that is the basis for its litigation position.
Our obligation is to review the rulings of law and fact on the record presented. On this record, preponderant evidence is on the side of obviousness. Thus the decision in this IPR proceeding should be affirmed, not vacated and remanded.
The America Invents Act was enacted to remedy the lack of expedition and to add predictability in infringement disputes, by assigning to an expert administrative tribunal and presumed expert federal court the resolution of some major patentability issues, with tight procedural rules and deadlines. It was expected that in the normal course questions of patentability under Section 102 and 103 would be reliably and speedily resolved. Implementing this policy, when we find analytic lapses by the PTAB, it appears that the statute contemplates that we will make the determination, on the record that was made at the Board. Indeed, the depth of briefing by the parties suggests that this was their understanding, too.
I don’t say that remands are never appropriate, but remands should be rare. Here the issues were fully developed, with eloquent argument all around, and an extensive Board opinion in which my colleagues find only slight gaps. Finality is available; it is our obligation to decide the merits.

. The district court action has been stayed pending resolution of the PTAB proceedings.

. LABio appeals the PTAB’s denial of priority to LABio’s provisional application, filed on *1070 October 22, 2002. Lilly points out, without apparent dispute, that the relevant prior art would not be eliminated by LABio's provisional application’s filing date of October 22, 2002, because all the references are prior art within the meaning of 35 U.S.C. § 102(a), even if they do not qualify under § 102(b). Lilly Br. at 18.